UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| TOVAR SNOW PROFESSIONALS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:15-cv-00200-DML-TWP |
| | ) | |
| ALL SEASONS GENERAL | ) | |
| CONTRACTING, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## Order on Cross-Motions for Summary Judgment

This is a breach of contract case. Both parties have moved for summary

judgment. The dispute is about whether under the "Standard Subcontractor Service

Agreement," All Seasons General Contracting, LLC (the subcontractor) is liable to

Tovar Snow Professionals for $159,515.26 that Tovar paid to a third party based on

a claim that snow removal and salt de-icing work performed by All Seasons at a

General Motors plant resulted in damages to car parts. Tovar also seeks to recover

attorneys' fees, costs, and expenses. As explained below, the court finds that

genuine disputes of material fact prevent summary judgment for either party.

### Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a). Substantive law determines the facts that are material. *Anderson*

*v. Liberty Lobby, Inc.,* 477 U.S. 242, 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A

genuine issue of material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.,* 477 U.S. at 249. The court construes the evidence in the light most favorable to the nonmoving party and draws all reasonable inference from the evidence in favor of the nonmoving party. *Zerante v. DeLuca,* 555 F.3d 582, 584 (7th Cir. 2009). When evaluating cross-motions for summary judgment, therefore, the court construes the evidence and its reasonable inferences in favor of the party against which the particular motion under consideration is made. *Metro Life Ins. Co. v. Johnson,* 297 F.3d 558, 561-62 (7th Cir. 2002). "[I]f genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate." *Olayan v. Holder,* 2011 WL 6300615 at *5 (S.D. Ind. Dec. 15, 2011).

To evaluate the parties' cross-motions, the court first sets forth below those facts about which there is no genuine dispute. These undisputed facts describe the parties' business relationship, explain the work provided by All Seasons at the GM plant, and describe the nature and context of the claim for which Tovar seeks indemnification. The court will address in the Analysis section of this order relevant disputed issues of material fact for which one side or the other is entitled to have the evidence construed in its favor.

## Undisputed Material Facts

Plaintiff Tovar Snow Professionals, Inc. ("Tovar") provides snow and ice removal services for commercial clients. (Affidavit of Ronald Wilson, Dkt. 49-1, ¶

3).[1]  Defendant All Seasons General Contracting, LLC ("All Seasons") also is in the business of providing snow and ice removal services (as well as other general contracting services for residential and commercial buildings).  (*Id.,* ¶ 7; Rhees Dep., p. 12, line 8 to p. 13, line 21).[2]  Tovar was hired by a facilities management company named Caravan Facilities Management, LLC to provide snow and ice removal services at a General Motors facility in Marion, Indiana.  (Wilson Aff., ¶ 6).   That facility manufactures automobile parts. Tovar subcontracted the snow and ice removal work to All Seasons, and Tovar and All Seasons entered into an agreement titled Standard Subcontractor Service Agreement.  (*Id.,* ¶¶ 7, 10).  Tovar and All Seasons had not previously worked together.  (Rhees Dep., p. 19, lines 4-15).  Under the Service Agreement, All Seasons agreed to provide snow and ice removal services at the Marion facility for the period November 1, 2012, through April 15, 2013. (Wilson Aff., ¶ 11).  The parties do not dispute the contents of the Service Agreement; its relevant provisions will be addressed in the Analysis section of this order.

    After entering into the Service Agreement but before beginning any work at the GM facility, the owner of All Seasons (Lucas Rhees) and other All Seasons crew members met with a representative from Caravan (the facilities manager) at the

---

[1]     Ronald Wilson is employed by Tovar and was an account manager at the relevant time who oversaw Tovar's snow and ice removal work for clients in Indiana.

[2]     Lucas Rhees is the owner and sole member of defendant All Seasons General Contracting, LLC.  Excerpts from his deposition are at Dkt. 49-2, Dkt. 54, pp. 27-42, and Dkt. 56-2.

GM facility. They attended a safety meeting. Mr. Rhees asked a Caravan representative where to push snow and where to salt at the facility, but the Caravan representative did not know the answers to the questions. (Rhees Dep., p. 21, line 16 to p. 24, line 11). Caravan had, however, given instructions to Tovar, and Tovar passed them along to All Seasons. (Wilson Dep., p. 48, lines 9-14).[3] All Seasons was instructed by Tovar that GM had a "zero tolerance" policy regarding the presence of snow and ice in the parking lots and drive lanes. (Wilson Dep., p. 47, lines 3-21, and p. 48, lines 15-21; Rhees Aff., ¶ 7; Plaintiff's Dep. Exh. 3, Dkt. 49-2 at pp. 36-37).

All Seasons maintained a pile of salt on the premises for its work and used bobcat equipment with attached salt spreaders to salt the outside lots, drive lanes, and loading docks. Tovar supplied some of this equipment and All Seasons used some of its own equipment. (Rhees Dep., p. 27, line 15 to p. 28, line 10 and p. 29, lines 12-23).

Large "containers" or "racks" were situated in at least one outside area of the GM facility, around which were driving lanes. The parties generally refer to these items as "racks" and the court will do so too. All Seasons salted the driving lanes around the racks. (Rhees Aff., ¶ 8). It had never been told not to use de-icing salts near the racks. (Rhees Aff., ¶ 6). Each rack is approximately 9 feet wide by 9 feet

---

[3]    Excerpts from Ronald Wilson's deposition are at Dkt. 54, pages 2-26.

tall and is open on the sides. (Land Dep., p. 10, lines 8-19).[4]  The racks were grouped in blocks and stacked three or four high.  (Land Dep., p. 9, lines 7-13). They are used to, eventually, hold (or "contain") car parts.  A rack filled with car parts fits inside a railroad car for transport.  (Datar Dep., p. 25, lines 16-22).[5] Though GM prefers to not store racks outside, there are times when it has too many racks at the Marion facility to store all of them inside.  (Davis Dep., p. 14, lines 17-20; Land Dep., p. 18, lines 8-14).

When car parts are ready to be loaded onto a rack, a rack is transported using a forklift by a GM employee from the outside lot to a loading dock area. (Davis Dep., p. 11, lines 1-23).[6] An "inside" GM forklift driver takes over from there.  If a rack is wet, GM's general procedure required placing the rack on a ramp once brought inside to allow any moisture to drain off and for the rack to dry before parts are loaded onto it.  (Vandermeir Dep., p. 40, line 10-13 and line 23 to p. 41, line 4).[7]

---

[4]  Excerpts from the deposition of Anita Land, who was an engineer at the GM Marion facility, are at Dkt. 49-3 and at Dkt. 54, pp. 63-77.

[5]  Excerpts from the deposition of Milind Datar, a GM employee, are at Dkt. 54, pages 90-98.

[6]  Excerpts from the deposition of Terry Davis, who was the GM facility area manager and had landlord-like responsibilities for the Marion facility, are at Dkt. 49-4 and Dkt. 54, pp. 52-62.

[7]  Excerpts from the deposition of George Vandermeir, who was the quality manager at the Marion facility, are at Dkt. 49-5.

In February 2013, GM's employees loaded car parts (mostly hood panels and some fenders) onto racks that had been brought from outside. (Davis Dep., p. 11, lines 20-23). As a general rule, GM personnel do not formally inspect racks when they are brought from outside and put in place for being loaded with parts at the end of the assembly line, although GM personnel "watch" to make sure that racks brought from outside are dry before loading them. (Vandermeir Dep., p. 12, line 24 to p. 13, line 4; lines; Land Dep., p. 19, lines 3-7). Parts, like hood panels, are inspected when they come off the line. (Vandermeir Dep., p. 11, line 15 to p. 12, line 14). If there were rust or corrosion on a part at that time, such a problem should be noticed. (*Id.*).

The now-loaded racks were placed in box rail cars—an enclosed environment—and shipped to a GM facility in Arlington, Texas. (Land Dep., p. 34, lines 14-19). When the parts were received in Arlington, Texas, quality control inspectors at that facility discovered problems with the parts. About February 11, 2013, Arlington notified Marion of problems they encountered, which included salt found on parts and racks and the presence of heavy rust on parts. (Land Dep., p. 7, line 10 to p. 11, line 2; Land Dep. Ex. 1)**.** The Marion facility began investigating the problem. The investigation was led by Anita Land, the Materials Packaging Coordinator at the Marion facility. She reviewed photographs of the parts damages sent by Arlington. (*Id.* at p. 8, lines 17-21). She looked around the Marion facility, inside and outside, and noticed what appeared to be chunks of de-icing residue of various sizes on the outside racks. (*Id.,* p. 8, line 22 to p. 9, line 13). She reported

in an email dated February 14, 2013, that the day before she and another GM employee (George Hensley) inspected racks then being stored outside and found that "salt was indeed sprayed into [racks]." (Dkt. 49-5 at p. 13). Ms. Land began formulating a plan to clean all racks at the Marion facility. (*See* Feb. 14, 2013 email).

The Arlington plant issued formal "Quality Alert" documentation in mid-February 2013 which described and depicted (by photographs) what appeared to be salt found on parts and racks and the presence of heavy rust on parts. The Arlington plant had already begun "scrapping out" over 400 car hoods (Dkt. 49-5 at p. 12). GM turned to Caravan, its facilities manager at the Marion plant, to respond to the problem and rectify it. (*See* Feb. 14, 2013 email, Dkt. 49-5 at p. 12). According to an invoice sent by Caravan to Tovar, Caravan's employees began cleaning racks at the GM Marion facility as early as February 14, 2013. (*See* Dkt. 49-5 at p. 23). That work involved bringing racks into a steam booth at the plant that produces hot water, and cleaning the racks with soapy water. (Davis Dep., p. 43, lines 3-14).

Caravan turned to its contracting partner, Tovar, about the problem. A meeting was held at the Marion plant on February 18, 2013. It was attended by representatives from General Motors (including the Marion facility manager, Terry Davis), Caravan, Tovar (Ronald Wilson and Chris Price),), and All Seasons (Lucas Rhees). The damage to parts shipped from Marion to Arlington was discussed. The General Motors representatives stated that GM had concluded after its

investigation that parts had become corroded because the racks used to transport them were contaminated with salt from de-icing the outside lots. (Wilson Dep., p. 74, lines 2-16). The problem was described as "severe," but the extent of damage was not addressed and no demand for payment was made. (Wilson Dep. p. 76, lines 17-25). After the meeting, Ronald Wilson (Tovar's representative at the meeting) inspected racks that were being stored outside. (Wilson Dep., p. 66, lines 2-7). He noticed salt on portions of the racks. (*Id.,* p. 66, lines 13-17). Mr. Rhees of All Seasons did not, at that point or any other, similarly look at the racks stored outside.

Caravan issued an invoice to Tovar dated March 28, 2013, in the sum of $159,515.26 for the "[c]ost of salt corrosion on panels and salty racks." (Dkt. 49-5, at pp. 21-33). Tovar received the invoice on or about its date. (Wilson Aff., ¶ 18). The amount consists of $140,699.93 attributed to GM's "cost to recover damage to hoods" and $18,815.33 attributed to Caravan's "labor costs associated with the damaged hoods." (Caravan Invoice, Dkt. 49-5 at pp. 21-22). The GM portion was calculated by GM; about 1/3 of the costs are labeled as "est." Neither Caravan nor Tovar questioned GM's calculation. (Wilson Dep., p. 78, lines 16-24 and p. 81, lines 8-15). The Caravan "labor costs" apparently are all attributed to cleaning racks at the Marion facility. That work (722 hours at $26.06 per hour) was done, according to the invoice, between February 14, 2017, and March 10, 2013. Tovar did not question the amount of the Caravan invoice. (Wilson Dep., p. 81, lines 8-15). Tovar

paid the Caravan invoice in full. (Wilson Aff., ¶ 19). The record does not establish when Tovar paid the invoice.

Against this factual background (and other evidence and inferences discussed below), the court now turns to the parties' arguments why each is entitled to judgment as a matter of law. The court explains why neither is so entitled.

## Analysis

The parties' cross-motions for summary judgment require the court to determine whether there is any genuine dispute of material fact about whether All Seasons breached the Service Agreement. Tovar argues that the contract was breached because All Seasons was, as a matter of law, required to reimburse Tovar for paying Caravan's invoice under the indemnity provision of the Service Agreement. *See* Tovar opening brief, Dkt. 48, at p. 14 ("Tovar is Entitled to Indemnification from All Seasons for the Damage It Caused to GM's Property") and at p. 18 ("All Seasons' refusal [to indemnify Tovar] is a breach of the indemnification provision as a matter of law.") All Seasons argues that, as a matter of law, it did not breach the indemnification provision because Tovar did not provide proper written notice of the claim as required by the contract, and All Seasons was prejudiced by the lack of proper written notice.

## I. The Agreement, and its indemnification provision, is governed by Illinois law.

The Service Agreement, at Section 9(C), contains a choice of law provision directing that it must be "interpreted, enforced and governed by and under the laws of the State of Illinois." The parties agree that Illinois substantive law governs.

9

## II. The indemnification provision first describes "indemnity events" and then provides a notice procedure.

The indemnification provision is lengthy, and it is worthwhile to include in this order the entire provision. It has two sections, A and B. Section A describes what constitutes an "Indemnity Event." Section B describes a notice procedure in the event of "any demand, claim or action which would be the basis of a claim by Contractor [Tovar] under the provisions of" Section A. The indemnification provision of the contract reads:

3. Indemnity[8]

A. Subcontractor hereby agrees to defend, indemnify and hold harmless Contractor, its affiliates, and each of their respective officers, directors, shareholders, employees, and agents (each, an "indemnified party") from and against any and all liability, loss, damage, cause of action, claim, cost and expense, including but not limited to, reasonable attorneys' fees and expenses, incurred as a result of or in connection with any of the following (each, an "indemnity event"), even if the negligence, gross negligence, or other tortuous conduct of one of the indemnified parties is a contributing, but not the sole, cause of the indemnity event: (a) any injury or death of persons whomsoever, including, but not limited to, officers, agents, employees or subcontractors of Contractor or Subcontractor or their respective subcontractors, loss or destruction of, or damage or delay to the property to whomsoever belonging, including the conversion thereof, arising from or relating to the performance of the Services; (b) Subcontractors' or its subcontractors' or their respective employees' or agents' or subcontractors negligence, willful misconduct or fraud, including but not limited to theft, embezzlement, defalcation or issuance of false or fraudulent receipts, reports or other documents; (c) Subcontractor's breach of or failure to perform Services; (d) any Hazardous Condition or other environmental contamination caused in whole or part by the acts or omissions of Subcontractor or its subcontractors or their respective employees or agents or sub-subcontractors; (e) Actions of Subcontractor or its subcontractors or their respective employees or agents or sub-contractors outside the scope of the authority granted under the Agreement; (f) subcontractor's or its subcontractor's use of

---

[8] The typographical and spelling errors in this provision are in the original contract.

equipment; (g) Subcontractor's failure to maintain insurance coverage required under this Agreement or to provide funds in satisfaction of any insurance deductible amount; or (h) claims made by third parties for services or labor provided or materials furnished to Subcontractor or its subcontractors, and (i) any breach of any other provision of this Agreement. Subcontractor shall also defend, indemnify and hold harmless the Indemnified parties in the foregoing manner with respect to the defense of claims and actions alleging that an Indemnified party's negligence, gross negligence or other tortuous conduct was or might have been the sole cause of the subject indemnity event, but Subcontractor's indemnification shall not extend to any judgment, award or settlement where it has been determined or agreed that the Indemnified party's negligence, gross negligence or other tortuous conduct was the sole cause of the Indemnity event or where the Indemnified party committed an intentional tort. Subcontractor's obligations under this Section 3.A shall not be limited in any way by any limitations on the amount or type of damages, compensations, or benefits payable by or for Contractor under workers' compensation acts, disability benefit acts, or other employee benefit acts and all such obligations shall survive any termination of this Agreement whether by expiration of time or otherwise.

B.  Upon receipt of notice by Contractor of any demand, claim or action which would be the basis of a claim by Contractor under the provisions of Section 3.A above (an "indemnified claim"), Contractor shall provide written notice of such indemnified claim. So long as Subcontractor is not in default in the performance of its obligations under this Agreement, as between Contractor and subcontractor, Subcontractor shall retain primary responsibility for the conducting of any legal and/or administrative action or other proceeding regarding any such indemnified claim (and "indemnified claim proceeding") and the defense (and any appropriate appeal) thereof. Legal counsel retained with respect to any indemnified claim proceeding shall be selected by Subcontractor, but shall be subject to the reasonable prior approval of Contractor. As between Contractor and Subcontractor, all costs incurred with respect to any indemnified claim proceeding (including, but not limited to, court cost and attorney's fees) shall be borne by Subcontractor, and Subcontractor's indemnification obligations set forth in Section 3.A above shall extend to all such costs. Nothing contained herein shall in anyway limit Contractor's right to participate and/or retain independent legal counsel, at Contractor's expense, with respect to any indemnified claim proceeding, but Contractor shall cooperate with Subcontractor and coordinate Contractor's participation and/or use of independent counsel in a matter not consistent with Subcontractor's positions and interests in such indemnified claim proceeding to the extent reasonably possible and not adverse to the interest of Contractor. Notwithstanding the foregoing, in the event Contractor determines, in Contractor's opinion, that there is a conflict of interest or other circumstance such Subcontractor's retained legal counsel cannot adequately

represent Contractor's interests in any indemnified claim proceeding, Contractor shall have the right to retain independent legal counsel and Subcontractor's indemnification obligation set forth in section 3.A above shall extend to all costs incurred with respect to such separate representation. Subcontractor's obligation to conduct and undertake any required indemnified claim proceeding or the defense thereof, and to bear the costs incurred with respect thereof, shall apply even in the event that there is an ultimate adjudication or other determination of liability of the Indemnified party attributable to the negligence, gross negligence or other tortuous conduct of such Indemnified party.

Thus, Section 3(A) lists nine events (described in subparagraphs 3(A)(a) through 3(A)(i))—each defined as an "indemnity event"—which trigger an obligation by All Seasons to indemnify and hold harmless Tovar. The indemnification extends to "any and all" "liability, loss, damage, cause of action, claim, cost and expense, including but not limited to reasonable attorneys' fees and expenses incurred as a result of or in connection with" an indemnity event.

Tovar's summary judgment brief (Dkt. 48 at p. 16) contends that Indemnity Events (a), (b), (c), (f), and/or (i) were triggered:

- The subparagraph (a) Indemnity Event is: "loss or destruction of, or damage or delay to the property to whomsoever belonging . . . arising from or relating to the performance of the Services."

- The subparagraph (b) Indemnity Event is: "negligence."

- The subparagraph (c) Indemnity Event is: "breach of or failure to perform Services."

- The subparagraph (f) Indemnity Event is: "use of equipment."

- The subparagraph (i) Indemnity Event is: "any breach of any other provision of this Agreement."

With respect to Indemnity Event (i)—any breach of any other provision of the Agreement—Tovar points to one "other provision" of the Agreement it claims was breached by All Seasons. *See* Dkt. 48 at pp. 15-16. It is Section 1(I), which states in full:

> Subcontractor shall take all necessary safety precautions with respect to performing services and shall comply with all safety rules and requirements from time to time specified by Contractor or by Owner and with all applicable laws, ordinances, rules, regulations, and orders of any public authority. Without limiting the generality of the previous sentence, Subcontractor shall make certain that Subcontractor's equipment and the operation thereof do not damage the paving of the Snow Removal Site or any light poles or other improvements or property thereon. In the event of any such damage, Subcontractor shall immediately notify Contractor and, at the request of Contractor shall promptly repair all such damage to the satisfaction of Owner without charge or expense to Contractor, Owner. If Owner or Contractor elects to repair such damages, Subcontractor shall pay all costs thereof upon demand.[9]

---

[9]      Tovar's reply brief argues that All Seasons' alleged breach of Section 1(I) of the Service Agreement is a claim it is pursuing independent of the indemnification provision of the Agreement, and thus notice procedures under the indemnification provision are irrelevant to whether it can recover against All Seasons. *See* Dkt. 55 at pp. 12-13. The court rejects that argument on summary judgment because it was raised for the first time in the reply brief. Tovar's opening brief framed its argument solely in terms of whether All Seasons was liable under the indemnification provision—that's the very heading of Section C of its brief which includes the reference to Section 1(I). Moreover, Tovar presented no analysis how it is entitled to judgment as a matter of law under this contract provision; it did not even cite the entire language of Section 1(I) until its reply brief. To obtain summary judgment, some analysis was needed to address (a) how All Seasons violated a safety rule or precaution or something akin thereto or address whether violation of a safety rule or precaution is necessary for a breach of Section 1(I); (b) why Section 1(I) should be interpreted to apply to alleged damages to car parts that were not on the Snow Removal Site and with which All Seasons' work had no direct physical contact; (c) how Section 1(I) could be applied to outside racks when there appears to be no allegation that the racks were "damaged"; or (d) how any failure to comply with the notice section of the provision affects its enforcement. Thus, even if Tovar had made clear in its opening brief that it was seeking judgment for breach of

Section 3(B) of the indemnification provision contains notice requirements from Tovar to All Seasons when Tovar receives notice of a claim in connection with an Indemnity Event, *i.e.*, notice "of any demand, claim or action which would be the basis of a claim by Contractor under the provisions of" Section 3(A).

**III.  Questions of fact prevent the court from deciding that All Seasons breached the indemnification provision and from deciding that Tovar breached that same provision, excusing All Seasons from any liability.**

The court will address later the state of the evidence about whether an Indemnity Event described in Section 3(A) occurred.  Even assuming that an Indemnity Event occurred, the court cannot conclude as a matter of law that either All Seasons or Tovar breached the indemnification provision in a way entitling either to summary judgment.  This breach of contract case must therefore be tried to the jury.

**A.  The evidence and reasonable inferences therefrom show that Tovar did not provide written notice of its claim before it already paid Caravan in full for the claim.**

Section 3(B) of the Service Agreement required Tovar to provide notice that Tovar claimed entitlement to indemnity.  The notice was to be in writing: "Upon receipt of notice by Contractor of any demand, claim or action which would be the basis of a claim by Contractor under the provisions of Section 3.A above (an

---

Section 1(I) independent of the indemnification provision (which it did not), Tovar did not meet its burden to adequately inform the court of the bases for its argument.

"indemnified claim"), Contractor shall provide *written notice* of such indemnified

claim." (emphasis added).

There is no evidence in the record that Tovar provided written notice to All

Seasons before Tovar had paid the Caravan invoice. The only written notice from

anyone associated with Tovar to anyone associated with All Seasons established by

the record is dated May 1, 2013. That date is more than a month after the date of

Caravan's invoice. Although there is no evidence about the date Tovar (or its

insurer) paid the invoice, the reasonable inference from the evidence is that Tovar

paid it before any written notice was made to All Seasons.

Tovar's third-party insurance claims administrator sent a letter dated May 1,

2013, to All Seasons' insurance agency (Hobson Insurance Agency) and All Seasons'

insurance carrier (Property Owners Insurance Company) enclosing the Caravan

invoice and demanding payment. (*See* letter dated May 1, 2013, Dkt. 56-3 at p. 8).

The May 1, 2013 letter states that Tovar's claims administrator had previously

"tendered" a claim to All Seasons and that All Seasons representative "indicated" he

had not reported the claim. (*Id.*). There is no information in the letter, or anywhere

else in the record, about when the claims administrator allegedly "tendered" the

claim to All Seasons or how the claim was "tendered"; it could have occurred orally

and, even if not, it could have occurred the very same day the May 1 letter was

written.[10] Moreover, Tovar admitted in response to a request for admission that the

---

[10]     All Seasons contends that the statement in the letter about the tender of a
claim to All Seasons is hearsay and should be disregarded by the court. But, even if

May 1, 2013 letter was "the first time any request was made in writing to All Seasons regarding any alleged claim for damages regarding the General Motors parts (hoods)." (*See* Answer to Request for Admission 8, Dkt. 57-1 at p. 4).

The only other evidence of any receipt by All Seasons of the Caravan invoice is a statement by Lucas Rhees, of All Seasons, in his affidavit that "All Seasons was not provided written notice of any 'claim' or lawsuit filed against Tovar . . . and Tovar had already paid an invoice from Caravan/General Motors, before Tovar presented All Seasons with a copy of the invoice and demanded payment." (Dkt. 54 at p. 44, para. 12). This testimony also does not establish a date when anyone associated with Tovar gave the Caravan invoice to All Seasons. It establishes only that by the time All Seasons had a copy of the invoice (which could have been as late as May 2013, when the invoice was sent to All Seasons' insurance agent and carrier), Tovar already had paid it. Tovar has provided no evidence about when it gave the Caravan invoice to All Seasons (if it ever did, apart from the communication by its claims administrator) and Ronald Wilson confirms that Tovar had already paid the invoice by the time requests were made to All Seasons for "reimbursement." (*See* Wilson Aff., Dkt. 49-1, paras. 20-21).

**B. Lack of notice does not entitle All Seasons to summary judgment.**

Tovar's failure to provide written notice of the allegedly indemnified claim before paying the Caravan invoice does not absolve All Seasons from potential

---

the court does not disregard it, the statement does not prove that written notice of a claim was made any earlier than May 1, 2013.

liability for all or any part of the claim, at least on this record and as a matter of law. Both parties agree that under Illinois law, as addressed by the Appellate Court of Illinois in *Williams v. BNSF Railway Co.,* 29 N.E.3d 1097 (Ill. App. 2015), notice requirements in contractual indemnification provisions are analyzed under the same principles that notice requirements in insurance policies are analyzed. *Id* at 1105. Insurance policies typically contain a notice provision requiring the insured to notify the insurer of a claim and state that proper notice is a prerequisite to coverage. *Id.* (citing *West American Ins. Co. v. Yorkville Nat'l Bank,* 939 N.E.2d 288 (Ill. 2010)). When an insurer seeks to avoid its coverage obligation on the ground notice was not timely or otherwise reasonably provided, Illinois courts analyze five factors to determine whether the notice was reasonable under the circumstances and not a ground for the avoidance of coverage. *Id.* In *Williams,* the court ruled that these factors "are relevant in the context of reasonable notice required in a contractual indemnification clause." *Id.*

The factors—which, the *Williams* court holds, generally present questions of fact, *id.*—are:

1. "The specific language of the policy's notice provisions";

2. "The degree of the insured's sophistication in the world of commerce and insurance";

3. "The insured's awareness that an occurrence as defined under the terms of the policy has taken place";

4. "The insured's diligence and reasonable care in ascertaining whether policy coverage is available once the awareness has occurred"; and

5. "Any prejudice to the insurance company."

*Id.*

Tovar, the indemnitee, is the "insured" under these factors and All Seasons, the indemnitor, is the "insurance company." There are genuine issues of material fact that prevent the court from deciding as a matter of law that Tovar's notice was so unreasonable that All Seasons should be absolved of any liability. Further, because All Seasons is seeking summary judgment based on an alleged lack of reasonable notice, the court must view the evidence and reasonable inferences on this issue in the light most favorable to Tovar. The court highlights some of the fact issues.

First, there are issues of fact about what All Seasons knew as of February 18, 2013, when it attended the meeting with GM, Caravan, and Tovar officials regarding the damaged car parts. It is undisputed All Seasons was told that GM had determined by its investigation that All Seasons' work was a root of the problem. There are disputed facts, however, about whether All Seasons was aware and should have been aware that a claim was being made at that meeting. According to Ronald Wilson (of Tovar), Mr. Rhees of All Seasons apologized at the meeting for "this occurrence and the damage it caused to GM's racks, vehicle hoods, and other products." (Wilson Aff., ¶ 16). Mr. Rhees disputes that testimony, and states that he never indicated to anyone that All Seasons was responsible for

alleged damage to any GM parts. (Rhees Aff., ¶ 15). While any notice of a claim at that meeting was not in writing, the *Williams* analysis does not begin and end with whether there was strict compliance with the language of a notice provision. Under *Williams,* the language of a notice provision is one factor in addressing whether the notice actually given is reasonable or unreasonable under the circumstances.

Second, a reasonable inference from Tovar's evidence (though All Seasons contests it) is that Mr. Rhees understood at and after the meeting that GM was holding All Seasons responsible for the damaged car parts, although the full extent of the damage was not yet known. Mr. Rhees thus had information at that point that might have caused a reasonable insurer (or indemnitor) to begin to investigate the matter rather than to ignore it until a written notice was tendered.

Third, there are questions of fact related to whether and the extent to which All Seasons was prejudiced by the making of written notice after Tovar had paid the invoice. All Seasons asks the court to determine on summary judgment that the prejudice to it was so great it should be relieved of any responsibility. The prejudice, according to All Seasons, stems primarily from its inability to conduct a thorough investigation and determine from an inspection of the car parts and the racks that de-icing salts definitively caused the alleged damages. According to the evidence on summary judgment, the car parts (or most of them) were scrapped at the GM Arlington plant and Tovar had no more ability than All Seasons to inspect those parts. Thus, timing of Tovar's written notice may not have caused All Seasons' inability to personally inspect the car parts.

There is evidence about the condition of the car parts when they arrived at GM's Arlington facility. GM's personnel took pictures of the parts and documented GM's contemporaneous investigation. There is evidence about the condition of the racks and eyewitness accounts (from Anita Land, Terry Davis, and Ronald Wilson) about the presence of de-icing salts on racks that were sited outside at the Marion facility. There is evidence about the manner (at high speed and at a relatively high level off the ground) in which de-icing salts were dispersed by the equipment used by All Seasons in its work,[11] upon which a reasonable inference may be made that de-icing salts likely (and perhaps very likely) regularly hit racks stored outside. All this evidence can be weighed by a jury, along with evidence that Mr. Rhees chose to not inspect the outside racks after the February 18 meeting (or apparently any time thereafter), and evidence that Caravan washed all racks before All Seasons inspected any of them and before Tovar provided written notice on May 1, 2013.

All Seasons' protest that undue prejudice must be presumed because without an inspection of the parts and the racks, it cannot determine with absolute certainty that de-icing salts caused the white rust on the car parts that was documented by GM's photographs and investigation is an argument that must be presented to a jury. Although All Seasons' expert (Conrad Christensen)[12] states in

---

[11]     *E.g.,* Wilson Aff., ¶ 17; Rhees Dep., p. 32 at lines 2-24. Ronald Wilson testified that he told Lucas Rhees that All Seasons was putting down too much de-icing salts, was driving too fast, and salt had been hitting office windows. (Wilson Dep., p. 44, lines 17-20 and p. 50, lines 2-24).

[12]     The court is satisfied that Mr. Christensen has the expertise to opine on conditions that can cause the kind of "white rust" corrosion documented by GM

his affidavit (though not in his expert report) that "[w]ithout testing of the parts at issue, it is not possible to determine with an acceptable degree of certainty what substance(s) caused the "white rust" corrosion," the statement is insufficiently precise. Certainty measured by what? Science? The law? Neither? Mr. Christensen's expert report states he is "critical" of the investigation conducted by GM because parts were not saved and chemical composition tests were not conducted of the white rust corrosion and of the salts themselves. (*See* Expert Report, Dkt. 54 at p. 88, ¶ 1). Yet he also states that the GM photographs depict "considerable white rust/corrosion damage to the galvanized steel parts" consistent with exposure to a corrosive agent other than plain water, which "could have occurred as a result of road deicing salt contamination to the racks." *Id.*

That opinion, along with evidence advanced by Tovar (its expert's opinions, the findings by GM Arlington, the testimony of Anita Land, and the testimony of

---

Arlington. He has a Bachelor of Science degree in Materials Science and Engineering from the University of California, Berkeley, and is a registered/licensed professional metallurgical engineer in California and in Nevada. *See* Christensen Aff., Dkt. 54, at p. 82, paras. 4-5. The court agrees with Tovar, however, that Mr. Christensen does not have the expertise to opine about what General Motors should or should not have done as a matter of prudent inspection or racks and parts storage practices. His lack of expertise about automobile quality control practices does not prevent him from opining about whether particular circumstances (such as storage of racks outside in areas of de-icing activity and the presence of moisture on racks) inevitably can lead to corrosion problems if salt comes into contact with parts. For example, it is appropriate for him to give an opinion, based on his expertise and fact assumptions supported by evidence that: "[A]ny salt contamination on the racks is too much, and could result in corrosion problems if it comes into contact with parts. It is impossible to salt the area around the racks and not expect some contamination, either from initial spreading of the salt or the subsequent splash and wind spray from vehicle/forklift traffic operating in the vicinity of the racks." *See* Christensen Expert Report, Dkt. 54, at p. 89, para. 4.

others who had the opportunity to inspect the racks) could convince a jury it is more likely than not that road de-icing salts combined with moisture (perhaps on racks that were not dried completely before loaded with the car parts and shipped to Arlington) corroded and damaged the parts. From that premise, a jury could conclude (though the court is not suggesting here that a jury must conclude) that All Seasons' inability to test the parts or look at racks did not result in undue prejudice because cause and effect fairly can be deduced by other available, and reliable, evidence.

A jury's assessment of prejudice may also include evaluating whether it was unreasonable for Tovar to pay the entire invoice without first allowing All Seasons input and investigation about the reasonableness of the charges, including consideration whether GM itself should bear some of the cost because of its own conduct. All Seasons asserts that GM bears some responsibility, but that too is an issue that is not amenable to summary judgment. There is evidence that the GM Marion facility did not previously (or subsequently) encounter corrosion issues like that experienced when All Seasons did the snow and ice removal work. There is evidence that All Seasons used a more high-powered de-icing salt delivery method than was used in past seasons. There is evidence that that method of spraying salt (at a high level off the ground and powerfully) led to an "assault" of salt crystals on the outside racks that was not experienced before, and GM therefore had no reason to treat its racks differently than it had in the past.

A jury may also consider the reasonableness of the Caravan invoice itself. It appears from the face of the invoice that some of the charges attributed to GM are estimated, and there is no back-up documentation for GM's charges. (*See* Invoice at Dkt. 49-5, p. 22). A portion of GM's costs appear to be for an "estimated" 636 man-hours at the Marion facility to "Wash and ID Racks," *id.,* yet Caravan also separately charged for 722 hours of work by laborers at the Marion facility to clean racks (with documentation of the dates, times, and persons performing that work). It is possible that the 636 estimated hours are subsumed within the 722 hours reported by Caravan, and thus labor costs were double-counted.

Further, the 722 hours spent washing racks (or 636 plus 722) may not be fairly associated with All Seasons' work if the labor included washing every rack at the Marion facility whether or not the rack ever was on the outside lot or, even if on the outside lot, was situated in a position on the lot that it came into contact with de-icing salt. According to Anita Land, who inspected the outside racks as part of her contemporaneous investigation, she noticed de-icing salts on some racks but not others depending on their location within the group of racks. Racks near the top (recall that 3 or 4 racks were stacked on each other) did not come into contact with salt; racks near the middle did not either. (Land Dep., p. 9, lines 7-13 and at p. 31, lines 14-25).

For all the reasons addressed above, the court cannot decide as a matter of law that Tovar's providing of written notice on May 1, 2013, was so unreasonable as to absolve All Seasons of any liability. Consequently, the court DENIES All

Seasons' motion for summary judgment. It also DENIES Tovar's motion for summary judgment because its motion depends on the court's finding that the notice Tovar gave to All Seasons was sufficiently compliant with the notice requirement under the indemnification clause and reasonable as a matter of law.

The court will also address, below, some of the issues of fact regarding the occurrence of an "indemnity event" under the indemnification clause.

### C. There are issues of fact regarding the occurrence of one or more of the indemnity events on which Tovar relies.

The court also cannot decide as a matter of law that one of the indemnity events relied on by Tovar was triggered. Recall that Tovar relies on one or more of the following events:

- Subparagraph (a): "loss or destruction of, or damage or delay to the property to whomsoever belonging . . . arising from or relating to the performance of the Services."

- Subparagraph (b): "negligence."

- Subparagraph (c): "breach of or failure to perform Services."

- Subparagraph (f): "use of equipment."

- Subparagraph (i): "any breach of any other provision of this Agreement."

There are issues of fact as to each one, and the court notes some of them.

As discussed above, part of deciding the notice/prejudice issue will require the jury to evaluate the evidence about All Seasons' inability to physically inspect and test the GM parts and the racks. In that context, the jury will consider whether

there is reliable evidence that damage to the parts arose from All Seasons' de-icing work around the racks on the outside lot. The evidence on summary judgment is very strong that (a) de-icing salts hit and stuck to (or landed in the crevices of) some racks stored outside on GM's Marion facility and that (b) de-icing salts on the racks, combined with some level of moisture, was the cause of the rust damage to the GM parts. The evidence is not, however, so conclusive, that the court should decide the issue as a matter of law, particularly because the same cause/effect evidence is relevant to the notice/prejudice issue. All Seasons is entitled to have a jury evaluate its expert's opinion that the failure to preserve racks (with salt) and parts (with rust) makes the conclusion reached by GM employees and Tovar's expert that All Seasons' work was the root of the problem insufficiently reliable for a conclusion that the damage to GM's property either arose from or was related to All Seasons' work (Indemnity Event (a)) or All Seasons' use of equipment (Indemnity Event (f)).

Disputed facts must be evaluated by a jury to decide whether All Seasons was negligent (Indemnity Event (b)) or whether All Seasons had breached or failed to perform its Services (Indemnity Event (c)). The parties dispute whether snow removal industry standards even existed, and thus whether All Seasons failed to or did not fail to follow industry standards. (Wilson Dep., p. 55, lines 1-9; Rhees Dep., p. 15, lines 21-23). All Seasons has cited evidence (generally the "zero tolerance" for ice anywhere on the GM lot) that it faithfully followed the instructions it was given regarding performance expectations, and thus should not be deemed negligent or as having committed a breach in the performance of its Services.

Finally, as to subparagraph (i)—breach of "any other provision" of the Agreement—Tovar relied on one other provision, Section 1(I). As the court explained in footnote 8, *supra,* there are issues a fact-finder must evaluate in applying that provision to the evidence.

When the evidence and the reasonable inferences therefrom are viewed in the light most favorable to All Seasons, the court cannot conclude as a matter of law that an Indemnity Event occurred or that proper notice was given to All Seasons requiring it to reimburse Tovar for the amount paid under the Caravan invoice.

Tovar's summary judgment motion also sought judgment for attorneys' fees. Because the court has found that genuine issues of fact prevent summary judgment, the court does not reach that issue. The court also notes that under Fed. R. Civ. P. 54(d)(2), a claim for attorneys' fees is made by motion *after judgment* unless substantive law requires their proof at trial as an element of damages. Whether substantive law requires proof of fees at trial was not addressed by the parties and is an issue that should be addressed at the final pretrial conference.

## Conclusion

For all the foregoing reasons, the court (1) DENIES Tovar's motion (Dkt. 47) for summary judgment and (2) DENIES All Seasons' motion (Dkt. 53) for summary judgment.

So ORDERED.

Dated:  July 11, 2017

Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record by email through the court's ECF system